STATE OF NORTH CAROLINA v. WILLIAM C. DRAKE

No. 708SC287

(Filed 27 May 1970)

**1. Homicide § 21—   first degree murder — sufficiency of circumstantial evidence**

Circumstantial evidence offered by the State was sufficient to send the case to the jury on the issue of defendant's guilt of first degree murder of his wife, and to support a verdict of guilty of second degree murder, where it tended to show that deceased suffered a brutal beating and was shot three times while in the trailer home in which defendant and deceased lived, and a legitimate inference arises from the evidence that the shots came from defendant's pistol and that at least part of the beating was administered with a hoe handle that was ordinarily kept in defendant's workshop on the outside of the trailer.

**2. Homicide § 14—   intentional use of deadly weapon — presumptions of malice and unlawfulness**

The intentional use of a deadly weapon, as a weapon, when death prox-

imately results from such use, gives rise to presumptions that the killing was (1) unlawful and (2) with malice.

**3. Homicide § 24— use of deadly weapon — presumptions — instructions**

In this homicide prosecution, the trial court erred in instructing the jury that once a killing is proven to have been done with a deadly weapon the law presumes malice, since in order for a presumption of malice to arise, it had to be established or admitted that the defendant *intentionally* used a deadly weapon, as a weapon, and inflicted wounds proximately resulting in death.

APPEAL by defendant from *Parker, J.,* September 1969 Criminal Session, LENOIR County Superior Court.

Defendant was tried under a bill of indictment charging him with the first degree murder of his wife on 1 November 1968.

The only evidence was that offered by the State and it tended to show as follows:

At the time of the alleged murder defendant and deceased lived with their four-year-old son in a trailer home in Lenoir County. Their nearest neighbors were deceased's uncle and his wife, Mr. and Mrs. Samuel Huggins. In the early morning hours of 1 November 1968, the Huggins received a telephone call from defendant and in response to the call they went immediately to the trailer. They entered the trailer at approximately 4:00 a.m. Mr. Huggins testified that he found the deceased lying on her back on the floor in the east bedroom. He pulled her to the door of the trailer so that she could get some air. Defendant was sitting or squatting near the telephone. He had on a pair of shorts and a T-shirt. The baby was sitting up in bed in a bedroom at the opposite end of the trailer from where the deceased was lying.

The sheriff and two deputies investigated the killing. They determined that Mrs. Drake was dead when they arrived. She was clothed in a reddish, short gown with a pair of pants. Blood was observed about the bed in the east bedroom and on the ceiling directly above the bed. Two pillows were saturated with blood. There was also blood on the mattress and sheets at the head of the bed and blood had run off the bed onto the floor. Blood was running down the left leg of a chair. Under the head of the bed there were three pieces of wood which when fitted together constituted a handle approximately 32¼ inches long. Blood and hair were embedded in the wood. The handle was identified by deceased's father as a hoe handle that was ordinarily kept in a workshop in back of the trailer.

The first deputy to arrive on the scene saw defendant standing in the east bedroom beside a chest of drawers. He was holding a shirt up to his side where he had been shot. The top drawer of the chest of drawers was open and an empty holster and several rounds of ammunition were inside. A woman's purse was found lying open on the floor of the living room with a dollar and 66 cents in change lying nearby. A man's billfold was on the counter separating the living room and dining room. A .38 caliber Smith and Wesson pistol, identified as belonging to defendant, was located on the ground 15 to 16 feet outside the front door of the trailer. Four empty cartridges and a single live bullet were in the cylinder which in this pistol could hold only 5 bullets. There was blood on the barrel.

Dr. John A. Parrott was stipulated to be an expert physician and surgeon, specializing in surgery. He performed an autopsy on the body of Mrs. Drake, starting at 3:00 p.m. on 1 November 1968. He found three bullet wounds about the body. Also: "[t]here were multiple wounds in the scalp and the scalp was real bloody and the hair was encrusted with blood. Apparently due to a blunt instrument the wound itself was rough and frayed. . . ." There were four abrasions just below the right knee on the immediate surface and three on the right foot, anterior surface. Severe bruises were on the right breast including five skin breaks on the left and two on the right. There were powder burns on the left front breast and the anterior neck; multiple bruises of the left scapular and hematoma formation; and the bone was fractured in the right forefinger. In the opinion of Dr. Parrott any of the three bullet wounds was sufficient to cause death, but in his opinion the bullet that did cause death passed through the anterior chest, the lung area, and severed the pulmonary vein resulting in severe hemorrhage. Two of the three bullets were recovered by Dr. Parrott from the body and turned over to the coroner. The third bullet was located by X-ray matted in the hair at the base of the deceased's skull and was given to a deputy sheriff.

A State Bureau of Investigation laboratory analyst testified that blood found on the deceased's nightgown, the pillow cases, mattress covers, bed sheet and pieces of carpet was human blood and of the "A" group, the same blood group as that of the deceased. Hair from the hoe handle was determined to be brown hair from a member of the Caucasian race.

Another State Bureau of Investigation agent, found by the court to be an expert specializing in firearms identifications and comparisons, testified that the three bullets taken from the body of deceased

and another bullet extracted from the wall of the trailer were fired from a .38 caliber Smith and Wesson pistol like the one belonging to defendant and found near the trailer. Because the bullets were in a distorted condition, the expert could not say whether they were actually fired from that particular weapon. He testified that based upon certain powder burn tests which he conducted, the pistol fired into the nightgown worn by deceased was fired from a distance of 16 to 24 inches and the pistol fired into the T-shirt worn by defendant was fired from a distance of 8 to 12 inches. The pistol belonging to the deceased fitted the holster found in the chest of drawers.

Mr. Paul T. Huggins, father of the deceased, testified that he visited his daughter's home two or three times a week. He went to her home on 31 October 1968 at approximately 9 o'clock in the evening. Defendant's car was parked in the driveway at the time with a flat tire. Defendant was there and reported that the deceased and young son had gone "trick or treating," as it was Halloween night. Huggins stated that he had never seen either the defendant's car or the deceased's car parked behind the trailer where they were found immediately after the killing. He also testified that he had seen the defendant strike the deceased on the shoulder on one occasion and had heard him at other times say "Damn it, Pat, do this" or "Damn it, do that." He further stated that on one occasion about a month before 1 November 1968 defendant told him, referring to deceased and the young son: "You can take both of them if you want to, I don't want them anyway."

The State offered evidence tending to show that on 22 October 1968 a policy of insurance was issued on the life of deceased in the sum of $2,400. On 25 October 1968 another policy was issued on the life of deceased in the same amount. On 31 October 1968 two accident policies were issued on the life of deceased, one in the amount of $1,000 and one in the amount of $1,200. Defendant applied for all of the insurance policies and he was named as beneficiary therein. They became effective when written and both of the accident policies contained a clause covering burglary. Similar accident policies had been written on the life of defendant with the deceased named as beneficiary.

The jury returned a verdict of guilty of murder in the second degree and judgment was entered sentencing defendant to imprisonment in the State's Prison for a period of 30 years. Defendant appealed.

. Robert Morgan, Attorney General, by Harrison Lewis, Deputy Attorney General, Robert G. Webb, Trial Attorney, and Howard P. Satisky, Staff Attorney, for the State.

Scott, Folger & Webster by A. D. Folger, Jr., and Brock & Gerrans by C. E. Gerrans for defendant appellant.

GRAHAM, J.

[1]   In our opinion the evidence, though circumstantial in nature, was sufficient to send the case to the jury on the issue of defendant's guilt of murder in the first degree, and to support a verdict of guilty of murder in the second degree. The evidence shows that deceased suffered a brutal beating and was shot three times. A legitimate inference arises that the shots came from defendant's pistol and that at least part of the beating was administered with a hoe handle that was ordinarily kept in defendant's workshop on the outside of the trailer. No suggestion is offered anywhere in the record that anyone, other than defendant, had access to the hoe handle or pistol, or was present when the deceased met her tragic death. Defendant's motion of nonsuit was properly denied and his assignment of error relating thereto is overruled.

[3]   Defendant assigns as error the following portions of the court's instructions to the jury:

> "Now the Court instructs you in regard to malice. Malice is not only hatred, ill will or spite, as those terms are ordinarily understood. To be sure, that is malice, but it also means that condition of mind which prompts a person to intentionally take the life of another without just cause, excuse or justification. It may be shown by evidence of hatred, ill will, or dislike, *and it is implied in law from the killing with a deadly weapon*. And the Court instructs you that a pistol or a gun is a deadly weapon. That is, Gentlemen of the Jury, *once a killing is proven to have been done with a deadly weapon the law presumes malice and therefore murder in the second degree at least*. Now premeditation and deliberation are issues of fact which the State must satisfy you from the evidence and beyond a reasonable doubt before you would be able to find murder in the first degree; that is, along with malice." (Emphasis added).

:   The above instructions contain prejudicial error requiring a new trial.

[2, 3]   The intentional use of a deadly weapon, as a weapon, when death proximately results from such use, gives rise to two presump-

tions: (1) that the killing was unlawful, and (2) that it was done with malice. *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322. The presumptions do not arise from the mere use of a deadly weapon — the use must be intentional. *State v. Debnam,* 222 N.C. 266, 22 S.E. 2d 562. And it is error where, as here, the court instructs that once a killing is proven to have been done with a deadly weapon the law presumes malice. *State v. Mercer, supra.* Nowhere in the instructions quoted above or anywhere else in the charge did His Honor explain to the jury that in order for a presumption of malice to arise, it had to be established or admitted that the defendant *intentionally* shot and killed deceased with the .38 caliber pistol.

The State contends that the court's omission was not prejudicial because the evidence so clearly established that if defendant shot deceased, he did so intentionally. We do not agree. To so hold would be to relieve the State of the burden of proving essential elements of the offense of murder in the second degree; namely, that the killing was unlawful and with malice. For these elements to be presumed present the burden is upon the State to satisfy the jury from the evidence beyond a reasonable doubt that the defendant *intentionally* used a deadly weapon, as a weapon, and inflicted wounds proximately resulting in death. See *State v. Mercer, supra,* and cases therein cited.

New trial.

MALLARD, C.J., and MORRIS, J., concur.